and to have a new certificate issued to him; that said certificate was issued, signed, and the seal of the company attached, and was sent to the defendant for his signature, and was duly received by him; that under the charter and by-laws of said company the president was required to sign or countersign all certificates of stock; that said certificate of stock was received by the defendant, and possession of the same was duly demanded by the plaintiff, and was refused,; that the par value of said certificate of stock is $1 per share; and that possession of it was duly demanded by the plaintiff, and refused.

Although the plaintiff claims that this complaint states a cause of action for conversion, yet we think it is apparent that the real injury of which the plaintiff complains is that the defendant, as president of the Jura-Trias Copper Company, has refused to transfer the shares in question. The transfer of stock in a proper case is a corporate act, and the failure of the proper officers of the company to perform their duty in this regard is an omission to perform their obligations to the corporation. When a corporation refuses to transfer stock, the person entitled to demand such a transfer has a cause of action against the corporation. 10 Cyc. 920. In discussing the case of the refusal by an officer of the corporation to transfer stock upon the demand of the person entitled to such transfer, Mr. Thompson, in his work on Corporations (volume 2, p. 1792, § 2449), says:

"It seems that he has no direct remedy against the directors or other officers of the corporation. He was not in privity with them. It is not regarded as a case of misfeasance, in which a stranger would have an action directly against the person doing him an injury, although such person may have claimed to act as the agent or servant of another; but it is rather a case of nonfeasance, in which the duty claimed flows from the corporation to the transferee of the shares, and not from its officers or agents, the latter being responsible only to the corporation itself."

We think that these views are applicable to the questions presented for determination upon this appeal, and that the complaint was properly dismissed in the court below.

Judgment affirmed, with costs.

---

(119 App. Div. 113)

### STRICKLAND v. MAGOUN et al.

(Supreme Court, Appellate Division, Second Department. April 19, 1907.)

1. BROKERS—DUTIES AND LIABILITIES TO PRINCIPAL—TITLE TO PROPERTY PURCHASED OR HELD BY BROKER—CONVERSION.

A firm of stockbrokers purchased a block of stock upon a margin for a customer, and were holding it as collateral security for a balance due on the purchase price. Subsequently the firm hypothecated the stock as collateral security for a call loan. The customer tendered the balance due on his stock and demanded its delivery, which was refused. *Held*, that the legal title to the stock was vested in the customer, and the unauthorized loan of it was a conversion thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, §§ 20, 27.]

2. SAME—CUSTODY AND CARE OF PRINCIPAL'S PROPERTY.

Where a customer leaves stock in the hands of a broker as collateral security for a balance due on its purchase price, a qualified relation of pledgor and pledgee exists, so that the broker, while he is not compelled to retain in his possession the identical stock purchased on his customer's

order, must have in his possession or under his control an amount of the stock in question equal to that purchased, which he can deliver to the customer when the account is closed.

**3. PLEDGES—NATURE OF LIEN—RIGHTS OF PLEDGEE.**

A firm of stockbrokers, who held stock belonging to a customer as collateral security for a balance due on the purchase price, hypothecated it as collateral security for a call loan; the pledgees accepting it in good faith without knowledge of the true owner. Subsequently, the loan being called and the firm being unable to pay it, one of their creditors undertook to borrow the money elsewhere. By hypothecating a part of the securities given as security for the first loan, he obtained part of the required sum and advanced the rest himself, taking as security the stock belonging to the customer, which he knew did not belong to the firm. *Held*, that his contract was entirely separate from the contract with the former pledgees, and he did not succeed to their rights as assignee.

**4. SUBROGATION—SUFFICIENCY OF PAYMENT OF DEBT.**

Where a creditor of a firm, which had hypothecated securities as collateral security for a loan which they were unable to pay, in order to protect his interests, raises part of the money elsewhere and supplies the rest himself, taking only part of the securities held by the former pledgee as security for his loan to the firm, he has no right of subrogation to the rights of the former pledgee which would interfere with the equal equities of a third person, whose stock, in the possession of the firm, had been unlawfully pledged as security for the loan.

Appeal from Special Term, Nassau County.

Action by William R. Strickland against Francis P. Magoun and others. From a judgment for plaintiff, defendant appeals. Affirmed.

The following is the opinion of Burr, J., in the court below:

Prior to October 17, 1901, the defendants Francis P. Magoun and Edward V. Van Duzer, together with one George B. Magoun, were copartners, carrying on business as stockbrokers under the name of Magoun Bros. & Co. On that date, at the request of Camillus G. Kidder, plaintiff's assignor, they purchased for his account, on a margin deposited by him with them, 100 shares of the common capital stock of United States Rubber Company. On December 16, 1902, the firm of Magoun Bros. & Co. was dissolved by the death of George B. Magoun. Up to that date the account of Kidder had been an open one. On November 29, 1902, the firm had rendered him a statement showing a balance due to them of $444.80, and that they held the said 100 shares of Rubber stock as collateral security therefor. After George B. Magoun's death, and between that date and September 25, 1903, Kidder paid to the surviving member of the firm $130 on account of his indebtedness. No other change took place in the account down to October 20, 1905. On that date Kidder tendered the balance then due to the surviving members of the said firm and demanded delivery of his stock, which was refused. Prior to the date of George B. Magoun's death the firm of Magoun Bros. & Co. had hypothecated to the firm of F. D. Winslow & Co. the 100 shares of Rubber stock purchased on Kidder's account, with a large amount of other securities, as collateral security for a call loan to them of $120,000. At the time of George B. Magoun's death the firm of Magoun Bros. & Co. was insolvent. Its liabilities greatly exceeded its assets. This fact was not, however, generally known. It did not have in its name, or under its control, and ready for delivery, the shares of stock purchased for Kidder, nor an equal amount of other shares of the same stock. It has never had since that date. On the 2d day of January, 1903, the firm of Winslow & Co. called its loan to the firm of Magoun Bros. & Co. The firm was unable to pay. The defendant James M. Quigley was one of its heaviest creditors. From the date of George B. Magoun's death he had been thoroughly acquainted with the condition of its affairs, and had taken an active part in assisting in the liquidation thereof. While he may have had hopes that through careful management it would eventually be able to pay its creditors, he knew that it could not at that time discharge its obligations. While he

may not have known to whom the stocks hypothecated as security for the Winslow loan belonged, he must have known that they did not belong to Magoun Bros. & Co., but were the property of various customers of theirs, held by the firm as security for the balances due from them. When the Winslow loan was called, Quigley and the surviving members of Magoun Bros. & Co. entered into an arrangement by which the best of the securities held by Winslow & Co. were to be hypothecated with various banks for the largest sum which they would loan thereon, such securities to be collateral to the firm note. The most that could be raised in that way was $70,000. This left $50,000 still due Winslow & Co. This sum the defendant Quigley advanced. The loan of Winslow & Co. was paid, and the securities delivered up. On the same day, January 2, 1903, Quigley received from Francis P. Magoun the demand note of Magoun Bros. & Co. for $50,000, together with such of the securities which had been hypothecated with Winslow & Co. as had not been rehypothecated, with the banks as security for the $70,000 loan above referred to. Included in this was 130 shares of Rubber stock. The books of Magoun Bros. & Co. showed that they were carrying 130 shares of Rubber stock for their customers, 100 shares of which they were carrying for Kidder. The note of $50,-000 given to Quigley on January 2, 1903, had not been paid. On October 30, 1905, Kidder tendered to the defendant Quigley the balance due on his account with Magoun Bros. & Co. and demanded the delivery of the stock, which was refused. Thereafter he assigned the stock, and any cause of action thereon, to the plaintiff, who brings this action against the surviving members of Magoun Bros. & Co. and against Quigley for conversion.

That the plaintiff can succeed against the defendants Magoun and Van Duzer is unquestioned. When a broker purchases for a customer stock upon a margin, the legal title to the stock vests in the customer. The relation of debtor and creditor existing between the customer and broker as to the unpaid balance of the purchase money, and the stock being in the possession of the broker, it is deemed pledged to him as security for such unpaid balance. The relation of pledgor and pledgee, therefore, arises, with this qualification to the usual rule applicable to such relation. It is not necessary that the broker should retain in his possession the identical stock purchased on his customer's order. It is sufficient if he has in his possession or under his control an amount of the stock in question equal to that purchased, which he can deliver to the customer when the account is closed. Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287; Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. Supp. 219. An unauthorized sale or an unauthorized loan of the stock is a conversion, thereof. If the broker for his own benefit mingles his customer's stock with other securities and rehypothecates them for a greater amount than the amount of the customer's indebtedness to him, not having under his control a like amount of stock with which delivery can be made if demanded, it is an unauthorized loan, and he is guilty of conversion. Douglas v. Carpenter, supra; Rothschild v. Allen, 90 App. Div. 233, 86 N. Y. Supp. 42. That is what Magoun Bros. & Co. did. Whether, at the time of the original loan from Winslow & Co. and the hypothecation, among other securities, of 130 shares of Rubber stock as collateral therefor, the firm had under their control another block of said stock from which delivery could have been made to Kidder, it is certain that on the 2d day of January, 1903, when the transaction with Quigley took place, they did not have, nor have they had since.

Is the defendant Quigley likewise guilty of conversion? A pledge of stock may be unauthorized so far as the broker is concerned, and yet the pledgee obtain a good title thereto. McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341. But such title must be founded upon a present and a valuable consideration, and the pledgee must have acted in good faith, and without knowledge of the claims of the true owner. Adams v. Bowerman, 109 N. Y. 23, 15 N. E. 874; Porter v. Parks, 49 N. Y. 564; Perth Amboy M. L. Ass'n v. Chapman, 80 App. Div. 556, 81 N. Y. Supp. 38, affirmed on opinion below 178 N. Y. 558, 70 N. E. 1104; McNeil v. Tenth National Bank, supra. For that reason, so far as appears in this case, Winslow & Co. could have held the Rubber stock hypothecated to them as security for their loan to Magoun Bros. & Co. even as against Kidder, the real owner thereof. For the same

reason, Quigley, unless in some way he had succeeded to the rights of Winslow & Co., cannot, even though the debt of Magoun Bros. & Co. to him is still unpaid. He ·had notice, at the time that he received the security, that it did not belong to Magoun Bros. & Co., and that they had no authority to pledge the same for their personal benefit. The fact that he did not know to which one of the customers of the firm it did belong would make no difference. It was enough that he knew that it did nót belong to the firm. Perth Amboy M. L. Co. v. Chapman, supra. Has he succeeded to the rights of Winslow & Co.? He has not succeeded to such rights as their assignee. The transaction through which the Rubber stock came into his hands was one between him and the surviving members of the firm of Magoun Bros. & Co. It was upon a new contract made with them, upon entirely different terms from their contract with Winslow & Co. Lancey v. Clark, 64 N. Y. 209, 21 Am. Rep. 604. Neither is he in a position to claim equitable subrogation to their rights. It may be conceded that the right of subrogation does not necessarily rest upon a contract, either expressed or implied. Mut. Life Ins. Co. v. Forty-Second St. R. R. Co., 74 Hun, 505, 26 N. Y. Supp. 545; Pease v. Egan, 131 N. Y. 262; Gans v. Thieme, 93 N. Y. 225; Cole v. Malcolm, 66 N. Y. 363. It may rest "on the basis of mere equity and benevolence" and be resorted to for the purpose of doing justice between the parties. But, being a doctrine of purely equitable origin and nature, its operation is always controlled by equitable principles. It is therefore never enforced so as to defeat or interfere with the superior or equal equities of third persons. 4 Pomeroy's Eq. Jurisprudence (3d Ed.) § 1419, note; Union Trust Co. v. M. & P. J. R. R. Co., 63 N. Y. 311, 20 Am. Rep. 541; Atlantic Trust Co. v. K. & H. R. R. Co., 17 App. Div. 212, 216, 45 N. Y. Supp. 492.

Just here is the fatal weakness of the defendant Quigley's position. He did not pay, nor furnish the means to pay, the entire ·debt of Winslow & Co. He did not take into his possession all of the securities which they held as collateral for the payment thereof. He was not in a position, therefore, if Kidder, in order to free his own stock from the lien of the pledgee, had desired to pay the entire debt of Winslow & Co., receiving all of the securities which they held, to have enabled him to do so. But that is not all. Quigley was a party to an arrangement by which the best of the Winslow securities were diverted to and pledged as collateral to other creditors. The less valuable securities, including the Rubber stock, were taken by him as security for the loan which he made. The effect of this was to increase the lien and burden upon the said stock. The margin between its value and the lien upon it in his hands was less than when all of the securities, good, bad, and indifferent, were in Winslow's hands. But by his acts Kidder's equities were still fur·ther prejudiced. After the securities came into his hands, Quigley withdrew from them certain stocks, which he claimed to be his own, imposing a still further burden of indebtedness upon the remaining stocks, including the Rubber stock. Under such circumstances, he cannot have subrogation. Before the transaction of January 2, 1903, his equities and those of Kidder, both being creditors of Magoun Bros. & Co., were equal. To permit him to be subrogated under the circumstances to the rights of Winslow & Co. would be to sacrifice Kidder's rights to his.

As between plaintiff and the defendants Magoun and Van Duzer, the date of the conversion was October 20, 1905. As between plaintiff and the defendant Quigley, it was October 30, 1905; these being the respective dates of the demand upon them, and their refusal to deliver the stocks. Jones on Pledges (2d Ed.) 571. I deem the 20th of November, 1905, a reasonable time to allow the plaintiff to replace the stock. Between the 20th day of October, 1905, and the 20th day of November, 1905, the stock was quoted steadily at 57.

The plaintiff is therefore entitled to judgment against all of the defendants for $5,700, less $395, the amount remaining unpaid on the stock, to wit, $5,305, with interest from the 20th day of November, 1905.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, HOOKER, GAYNOR, RICH, and MILLER, JJ.

Alfred S. Brown, for appellant.
Romaine H. Crosby, for respondent.

PER CURIAM.   Judgment affirmed, upon the opinion of Mr. Justice Burr at Special Term, without costs.

---

(54 Misc. 258)

BOTTOME v. NEELY et al.

(Supreme Court, Appellate Term.   May 16, 1907.)

1. REFERENCE—FEES OF REFEREE—PARTIES LIABLE.
     All parties to an action or special proceeding are liable for the fees
of a referee, including those objecting to the appointment of the referee.
     [Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reference, § 111.]

2. COURTS—UNOFFICIAL STENOGRAPHER—COMPENSATION—PARTIES LIABLE.
     The rule that all parties to an action or special proceeding are liable
for the fees of a referee applies to the fees of an unofficial stenographer
employed with the consent and acquiescence of the parties.
     [Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 200.]

3. ATTORNEY AND CLIENT—STENOGRAPHER'S AND REFEREE'S FEES—POWER
OF ATTORNEY.
     An attorney has power to bind a client for the payment of stenog-
rapher's and referee's fees.

4. REFERENCE—LIABILITY FOR FEES OF REFEREE.
     Where, in proceedings to have the bond of defendants as adminis-
trators of estate increased, the surrogate ordered a reference, and the
parties to the proceeding stipulated for the employment of a stenog-
rapher at a certain compensation, to be made a part of the referee's
fees and paid out of the estate, defendants were not liable individually
for the fees.
     [Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reference, § 111.]

Appeal from Municipal Court, Borough of Manhattan, Eleventh
District.

Action by Willard B. Bottome against James R. Neely and others
to recover certain referee's and stenographer's fees.   Judgment for
plaintiff, and defendants appeal.   Reversed.

Argued before GILDERSLEEVE, P. J., and SEABURY and
BRADY, JJ.

Sanford S. Gowdey, for appellants.
Jesse Grant Roe, for respondent.

GILDERSLEEVE, P. J.   All defendants were sued as individuals.
The appellants are, and have been since early in 1905, administrators
of the estate of Agnes C. Taylor, deceased, who died intestate.   In
1905, in New York county, in the Surrogate's Court, one Davies ob-
tained an order to show cause why the bond of said administrators
should not be increased.   The administrators opposed that motion,
and the Surrogate's Court, on its own motion, by order of July 11,
1905, directed a reference to John S. Jenkins, as referee, to take evi-
dence and report, with his opinion, with all convenient speed.   The
parties met—the appellants as administrators—to take evidence before